## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

ADEBOWALE SADARE,                                   Case No. 19-cv-3083 (NEB/ECW)

       Plaintiff,

v.                                                                    **ORDER**

BOSCH AUTOMOTIVE SERVICE
SOLUTIONS INC., BOSCH
AUTOMOTIVE SERVICE SOLUTIONS,
LLC, ROBERT BOSCH LLC, and
ROBERT BOSCH NORTH AMERICA
CORPORATION,

       Defendants.

This matter is before the Court on Plaintiff's Motion to Compel Discovery (Dkt. 56) ("Motion"). For the reasons stated forth below, the Motion is granted.

## I.      BACKGROUND

### A.      Factual Background

Plaintiff Adebowale Sadare ("Sadare") asserts claims for reprisal under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.15; retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203; disability discrimination under the MHRA, Minn. Stat. § 363A.08, and the ADA, 42 U.S.C. § 12112; and failure to accommodate under the MHRA, Minn. Stat. 363A.08, and the ADA, 42 U.S.C. § 12112, against Defendants Bosch Automotive Service Solutions Inc., Bosch Automotive Service Solutions, LLC; Robert Bosch LLC; and Robert Bosch North America

Corporation (collectively, "Bosch").  (*Id.* ¶¶ 69-119 (Counts 1-6).)  Sadare alleges he was disabled due to his narcolepsy and hypersomnia, which manifested in slowed or slurred speech patterns, as well as memory and concentration loss and lapses in focus and attention.  (*Id.* ¶¶ 2, 20.)

Sadare alleges he was employed by Bosch from February 2014 until his employment was terminated on December 22, 2016.  (*Id.* ¶¶ 21, 65.)  In the Complaint, Sadare alleges that as part of his employment, Bosch agreed to sponsor his permanent residency application.  (*Id.* ¶ 22.)  Sadare claims that he excelled in various aspects of his job while employed by Bosch; that he received positive feedback for his performance; and that he received performance-based bonuses.  (*Id.* ¶¶ 23-26.)  Sadare further claims that despite his high-performance, his colleagues consistently made derogatory remarks about his speech patterns and neurological impairments.  (*Id.* ¶¶ 27-32.)  Sadare alleges these comments continued after he complained about them to his supervisors and that they "gained traction" with other employees, "who came to accept that [Sadare's] speech patterns diminished his ability to communicate and that his focus/attention issues signaled a lack of intelligence," even though his performance reviews praised his communication skills and high-level performance.  (*Id.* ¶ 32.)

Sadare asserts that he sought a meeting with HR representative Brenda Kollar because he had learned that Defendants had not completed a necessary step for his permanent residency application and his work visa was going to expire in January 2017.  (*Id.* ¶ 33.)  That meeting occurred on August 5, 2016, during which Kollar "brushed off the delay and used the meeting to confront Sadare about 'complaints' she heard about his

job performance." (*Id.*)  On August 10, 2016, Thomas Knapp, a manager in another work group, referenced "'complaints'" about Sadare's job performance, but when asked for details, "made a vague allusion to 'accountability'" but did not have any examples.  (*Id.* ¶ 38.)  This prompted Sadare to inquire about his performance from two of his supervisors, who informed him that they were unaware of performance related issues and did not have anything negative to say about his performance.  (*Id.* ¶ 41.)  Shortly thereafter, on August 17, 2016, Sadare was placed on a performance improvement plan ("PIP"), requiring him to complete several tasks during a stated period to avoid termination.  (*Id.* ¶¶ 42, 43.)  Due to Sadare's belief that the complaints lodged against him by his colleagues stemmed from his disability symptoms, Sadare signed the PIP "under protest" and noted therein that he believed the PIP was "due to his disability."  (*Id.* ¶ 45.)  Sadare alleges that he completed all tasks in the PIP on November 11, 2016.  (*Id.* ¶ 58.)

On September 15, 2016, another HR representative inquired about Sadare's disability and on November 3, 2016, Sadare provided a letter from his neurologist regarding the same to Bosch.  (*Id.* ¶¶ 49, 56.)  In the meantime, Sadare provided two letters from his lawyer regarding his disability and accommodation requests to a Bosch HR representative on September 27 and October 19, 2016.  (*Id.* ¶¶ 50-53.)  These letters sparked settlement discussions between Sadare's lawyer and Bosch. (*See generally* Dkt. 62 at 8-14 (describing letters and timeline of discussions).)[1]

---

[1]     All page citations are to the CM/ECF pagination unless stated otherwise.

Sadare alleges that on October 20, 2016, Bosch received "completed visa-extension paperwork that required Bosch's signature" and would extend his visa beyond January 2017. (Dkt. 1 ¶ 54.) According to Sadare, the only remaining step was for Bosch to sign the completed paperwork, but Bosch refused to do so. (*Id.*) On October 26, 2016, Bosch withdrew its sponsorship of Sadare's permanent resident application. (Dkt. 1. ¶ 55.) Due to a lack of response to the November 3, 2016 letter, Sadare's neurologist sent another letter regarding his disability and requests for accommodations to Bosch's HR department on December 8, 2016 and again on December 15, 2016, but Bosch did not respond to those letters. (*Id.* ¶¶ 59-63.) On December 22, 2016, Bosch terminated Sadare's employment. (*Id.* ¶ 65.)

Sadare asserts that Bosch engaged in reprisal and took retaliatory actions against him after he informed them of his disability and accommodation requests. (*Id.* ¶¶ 69-83).) Specifically, Sadare alleges Bosch: (a) refused to submit his H-1B visa-extension paperwork; (b) withdrew its sponsorship of his permanent residency application; and (c) ultimately terminated him after he complained about his PIP, "which was motivated by symptoms of his disability" and requested accommodations for his disability. (*Id.* ¶¶ 71-72, 78-79.)

## B. Procedural Background

As filed, Sadare's current Motion seeks to compel production of four unredacted emails from Bosch, or in the alternative, conduct an *in camera* review of the emails. (Dkt. 58, Dkt. 59 at 1.) Bosch opposes production on the grounds that the emails are protected from disclosure under the attorney-client privilege. (*See generally* Dkt. 62

(Bosch's opposition).)  Bosch also contends the emails are not relevant because "Mr. Sadare has not brought a claim for National Origin Discrimination, making his inquiry entirely irrelevant.  Further, [Bosch's] actions do not constitute adverse employment actions for purposes of either Mr. Sadare's Disability Discrimination Claim or his claim for alleged Retaliation."  (*Id.* at 2 (footnote omitted).)

On August 24, 2021, this Court held a hearing on the Motion.  (Dkt. 67.)  At the hearing, Sadare informed the Court that the parties had resolved their issue as to one of the emails, submitted as Exhibit C (Dkt. 60-2, Ex. C).  Therefore, the only remaining active dispute between the parties as to the present Motion pertains to email chains labeled as Exhibits A, D, and E (Dkt. 60-1, Ex. A ("October 26, 2016 email"); Dkt. 60-3, Ex. D ("December 7, 2016 email"); Dkt. 60-4, Ex. E ("December 1, 2016 email")).  According to Bosch, these "communications discuss[] legal advice received from counsel between the Company's HR Director, Bonnie Scherwitz," who made the decision to terminate Mr. Sadare after consulting with at least two lawyers, and two of Mr. Sadare's managers, Thomas Knapp and Marco Kempin.  (Dkt. 62 at 1-2.)

In its brief, Bosch asserts that the redacted portions of the October 26 email:

surround a discussion between Mr. Knapp and Ms. Scherwitz on October 26, 2016 – the day that Mr. Sadare was informed that BASS would not support an extension of the six-year H-1B period and that the PERM process relative to Mr. Sadare's Green Card failed, as BASS located at least one minimally-qualified U.S. citizen/U.S Permanent Resident.  The redacted portion from Mr. Knapp refers to "one of the earlier discussions" where immigration topics were discussed and reveals privileged communications provided to BASS by its external Immigration Counsel, Fragomen.

(Dkt. 62 at 14.)

5

As for the December 1 email, Bosch asserts:

[The December 1 email] is a communication dated December 1, 2016, between Mr. Kempin and Mr. Knapp that was a response by Mr. Knapp to an email from Mr. Kempin asking whether there is "anything new on the labor law front." (Mr. Kempin's email was not provided as part of Exhibit E to the Motion). This response to a request for "anything new on the labor law front" by Mr. Kempin seeks information that was provided to BASS from counsel and clearly involves a discussion of legal advice between Mr. Kempin and Mr. Knapp.

(*Id.* at 15.)

Finally, as to the December 7 email, Bosch asserts that it "is a communication between Mr. Knapp and Mr. Kempin conveying information received by BASS Human Resources from external counsel, Fragomen, concerning Mr. Sadare's immigration status, including the January expiration of Mr. Sadare's six-year H-1B term." (*Id.*) Bosch did not file any affidavits from Scherwitz, Knapp, or Kempin supporting these assertions.

At the August 24 hearing, the Court granted the Motion in part and ordered Bosch to produce the unredacted emails to the Court for an *in camera* review to determine whether the attorney-client privilege applies. (*Id.*) Bosch provided the three emails on August 27, 2021. Portions of the emails are in German. (*See* Dkt. 60-1, Ex. A; Dkt. 60-3, Ex. D; Dkt. 60-4, Ex. E.) As no party has provided the Court with a translation of the emails, the Court has used commonly available translation software to understand their contents.

## II.   LEGAL STANDARD

### A.   Scope of Discovery

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). While Rule 26 contemplates a liberal scope of discovery, this Court "possess[es] considerable discretion in determining the need for, and form of, discovery . . ." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942, 949 (D. Minn. 2015) (citations omitted).

Relevance encompasses "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in this case." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978). The Eight Circuit has held that the party seeking discovery has the burden of showing relevance before the requested information is produced. *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). This threshold showing "is met if the information sought is 'relevant to the subject matter involved in the pending action.'" *Orduno v. Pietrzak*, No. 14-cv-1393 (ADM/JSM), 2016 WL 5853723, *3 (D. Minn. Oct. 5, 2016) (quoting *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.,* 187 F.R.D 578, 589 (D. Minn. 1999)). Further, not only must information sought in discovery be relevant, it must also be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "In determining proportionality, courts consider numerous factors, including 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the

parties' resources, and importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *Foster v. Litman*, No. 19-CV-260 (JNE/ECW), 2020 WL 39192, at *2 (D. Minn. Jan. 3, 2020) (quoting *Beseke v. Equifax Info. Servs., LLC*, No. 17-CV-4971-DWF-KMM, 2018 WL 6040016, at *3 (D. Minn. Oct. 18, 2018), quoting Fed. R. Civ. P. 26(b)(1)).

In accordance with Federal Rule of Civil Procedure 37, "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). And "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3)(B).

## B.   Attorney-Client Privilege

Neither party addressed whether the federal common law of privilege or Minnesota law applies here. "When making a privilege determination, a court uses federal common law unless a relevant federal rule, statute, or constitutional provision applies. . . . But where state law determines the decision in a civil case, state law governs the privilege issue." *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *5 (D. Minn. Apr. 1, 2014) (citations omitted). Sadare has asserted federal and Minnesota state law claims in this case, so the Court will apply both federal and Minnesota state privilege law to the emails at issue. *See id.* (analyzing privilege claims under federal and state law where plaintiff asserted claims under federal and state law and both types of claims had survived summary judgment).

8

"Under both federal and Minnesota law, confidential communications between an attorney and his or her client 'are absolutely privileged from disclosure against the will of the client.'" *Id.* at \*6 (citing *Diversified Indus., v. Meredith,* 572 F.2d 596, 602 (8th Cir. 1977); *Nat'l Texture Corp. v. Hymes*, 282 N .W.2d 890, 895 (Minn. 1979)).  The party asserting the privilege "bears the burden of proving the factual basis for the assertion." *Id.* (citing *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985); *Kobluk v. Univ. of Minn.*, 574 N.W.2d 436, 440 (Minn. 1998)).

Under Eighth Circuit law, attorney-client privilege applies when a communication is: (1) confidential; (2) between an attorney and client; and (3) for the purposes of obtaining legal services or advice.  *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984).  Under Minnesota law, the attorney-client privilege applies:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Kobluk*, 574 N.W.2d at 440 (cleaned up).  "In both jurisdictions, the privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Ewald*, 2014 WL 1309095, at \*6 (cleaned up).

The Court turns to the question of the attorney-client privilege in the corporate context.  While some Circuits apply the "control group" test in determining the applicability of the privilege as it relates to communications by corporations, the Eighth Circuit has rejected that test and has instead established that the privilege extends to

9

communications by a corporation if "(1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents." *Diversified,* 572 F.2d at 609; *see also Ewald v. Royal Norwegian Embassy,* 11-cv-2116 (SRN/SER), 2014 WL 1309095, at *7 (D. Minn. Apr. 1, 2014) (stating test for maintaining attorney-client privilege in corporate context under Eighth Circuit law)). "Minnesota has not established a separate test for corporations." *Ewald*, 2014 WL 1309095, at *7; *see also Leer v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 308 N.W.2d 305, 308–09 (Minn.1981) (reviewing attorney-client privilege tests in the context of corporations but not adopting any of those reviewed).

To determine whether an intra-corporate communication is covered by the privilege, the Court decides "whether the document first came into existence as part of a communication to the attorney . . . and whether it was later internally communicated to only those employees who have a need for or act upon the legal advice." *Everson Jr., M.D. v. Minn. Valley Surgery Ctr., LLC*, 2019 WL 6798471, at *9 (D. Minn. Aug. 28, 2019) (quoting *Kobluk*, 574 N.W.2d at 441; *ADT Sec. Servs., Inc. v. Swenson*, No. 07-2983 (JRT/AJB), 2010 WL 2954545, at *5 (D. Minn. July 26, 2010); *Safco Prods. Co. v. Welcom Prods., Inc.,* No. 08-4918 (JRT/JJG), 2010 WL 11252007, at *2 (D. Minn. Feb. 10, 2010)).  "An employee is on a need to know basis, so as to preserve the attorney-

10

client privilege, if he is a policymaker for the corporation (i.e., an executive) or is responsible for the specific subject matter at issue in the communication." *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, No. 06-cv-4112 (ADM/JSM), 2009 WL 10677479, at *21 (D. Minn. Mar. 23, 2009).  This mechanism preserves the privilege between employees of a corporation even though counsel is not directly engaged in the communication.  *Id.*  "The corporation has the burden to show that these requirements apply to the communication." *Ewald*, 2014 WL 1309095, at *7.

### III.   <u>ANALYSIS</u>

As stated previously, the parties dispute whether the October 26, 2016 email, December 7, 2016 email, and December 1, 2016 email (collectively, the "Email Exhibits") are shielded from discovery due to the attorney-client privilege.  The Court will begin by examining whether the Email Exhibits are relevant to this current matter. The Court will then turn to the question of whether the Email Exhibits constitute protected documents under the attorney-client privilege.

### A.   **Relevance of the Email Exhibits to the Current Matter**

Sadare alleges that Bosch engaged in reprisal and retaliated against him by refusing to submit his H-1B visa-extension paperwork, withdrawing its sponsorship of his permanent residency application, and terminating his employment.  (Dkt. 1 ¶¶ 72, 79.) Sadare argues that under the standard set forth in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), Sadare must demonstrate that Bosch's actions "'might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" and that "termination of one's ability to legally work in the United

11

States well might dissuade a reasonable worker from reporting discrimination, identifying disabilities, and requesting accommodations."  (Dkt. 59 at 9-10 & n.35 (citing *Burlington Northern & Santa Fe Railway*, 548 U.S. at 54).)

Bosch argues, however, that documents pertaining to its decisions not to extend Plaintiff's H-1B visa and to withdraw its sponsorship for Plaintiff's permanent resident application are irrelevant and inadmissible because Sadare "has since abandoned his National Origin and Race claims."  (Dkt. 62 at 9 n.4.)  At the hearing, Bosch repeated this assertion and also took the position that the Court should deny the Motion because Sadare had resisted immigration-based discovery and Bosch has been precluded from pursuing discovery that would allow Bosch to defend against claims that Bosch retaliated against Sadare by not seeking a visa extension or sponsoring Sadare's application for permanent residency.  Bosch also stated that any evidence as to Sadare's visa or application for permanent residency would be inadmissible at trial.  Bosch suggested that if the Court found the Email Exhibits relevant, the Court should give Bosch an additional 60 days to conduct discovery as to immigration-related issues.

The Court first considers the question of relevance.  The Court agrees that the possibility that an employer might not seek an extension of a work visa or decide against sponsoring an application for permanent residency if an employee reported discrimination or a disability, or sought a disability accommodation, might well dissuade a worker from engaging in that protected conduct.  *See Burlington Northern & Santa Fe Railway*, 548 U.S. at 54.  Bosch admits the emails relate to Sadare's immigration and employment status.  (Dkt. 62 at 14-15.)  Based on these facts, the Court finds that actions

Bosch took relating to Sadare's H-1B immigration and employment status during this time period and discussions about those topics are relevant at least to his claims of reprisal and retaliation.  Further, even if Bosch succeeds in its anticipated motion in limine, that would not warrant denial of the Motion, as Rule 26 explicitly allows parties to discover relevant materials even when they may not be admissible.  *See* Fed. R. Civ. P. 26(b)(1).

Bosch suggests that the Court should not order production of the Email Exhibits because it has been precluded from engaging in immigration-related discovery due to this Court's April 24, 2020 oral order granting Sadare's Motion for Protective Order (Dkt. 16) limiting the scope of Bosch's subpoena for documents issued to Sadare's former employer, Illinois Tool Works, Inc.  (*See* Dkt. 29 (minute entry); Dkt. 37 at 1 (describing scope of April 24, 2020 oral order).)  As U.S. District Judge Nancy E. Brasel found when overruling Bosch's objections to the April 24, 2020 oral order, Bosch "could renew its discovery requests in the future if it made a threshold showing of relevance, demonstrated that it had tried to first obtain the materials from Sadare himself, and drafted more narrowly-tailored requests," "Bosch may draft a more narrowly-tailored subpoena," and nothing in Judge Brasel's Order "prohibits a second subpoena or objections to it."  (Dkt. 37 at 3-4.)  The Court finds that neither the April 24, 2020 oral order nor any subsequent objections by Sadare to immigration-related discovery (none of which were brought to the Court's attention) constitutes a basis for denying production of the Email Exhibits.

Finally, the Court also denies Bosch's oral request for additional discovery on immigration-related issues.  To the extent Sadare objected to immigration-related

discovery after the Court's oral order on April 24, 2020, Bosch never sought relief from the Court. The Court will not order additional discovery based on an oral request (rather than a properly filed motion) and incomplete record. *See* D. Minn. LR 7.1(b).

## B.    Bosch's Assertions of Privilege

Having found the Email Exhibits are relevant to Plaintiff's claims, the Court turns to Bosch's assertions of privilege. It is undisputed that no attorney is a sender or recipient on any of the Email Exhibits. Citing several cases from outside of the Eighth Circuit, Bosch argues that the privilege can extend to communications even when no attorney is involved and takes the position that the communications are privileged because the senders and recipients are within a "circle of common interest." (Dkt. 62 at 16-19; *see* Dkt. 60-5, Ex. F (email meet-and-confer).) Bosch also argues that the Email Exhibits reference earlier discussions involving legal advice provided by counsel or convey information received from counsel. (Dkt. 62 at 18-19.)

Sadare, who apparently understood Bosch's argument as set forth in the meet-and-confer emails to constitute a "control group" argument, argues that Email Exhibits fail the "control group" test because Scherwitz was the sole decision maker with respect to the decision to terminate Sadare's employment, to not seek an extension of Sadare's H-1B visa, and not support his application for permanent residency, and that she made that decision on October 20, 2016. (Dkt. 59 at 4, 7.) Sadare argues that based on Scherwitz's testimony, Knapp and Kempin were not involved in those decisions. (*Id.*; *see also* Dkt. 60-6, Ex. G (Dep. Tr. of Bonnie Scherwitz at 59:6-62:21).) At the hearing, counsel for Bosch conceded that Knapp and Kempin were not the decision makers, that they did not

14

have much influence (if any) as to his immigration status, and that Knapp in particular would not necessarily have been involved in decisions around immigration.

The Court agrees that a corporate communication need not include an attorney to be protected by the attorney-client privilege. *See Wilson v. Corning, Inc.*, 2014 WL 12600838, at *2 (D. Minn. Oct. 24, 2014) ("Indeed, the Court agrees that some corporate communications between non-attorney employees may be protected when under the direction of counsel in certain scenarios."). In analyzing the unredacted versions of the Email Exhibits, the Court did not apply the "control group" test, as the Eighth Circuit adopted a broader test in *Diversified* and because Bosch has argued a "circle of common interest" rather than a "control group." In any event, as explained in Sections III.B.1-3, Bosch has not shown that Knapp or Kempin were in any position to control or take substantial part in any decision about any action to be taken on the advance of any attorney as it relates to Sadare, *see Leer*, 308 N.W.2d at 308 (describing "control group" test), particularly where Scherwitz made all the decisions as to Sadare on her own before any of these emails were sent. Bosch relies generally on Knapp and Kempin's supervisory responsibilities over Sadare as a basis for its assertion of privilege. (Dkt. 62 at 17-19.) But Bosch has not explained why either Knapp or Kempin, regardless of their supervisory status, needed to know the specific redacted information in the email at issue when Bosch has claimed that neither Knapp nor Kempin was a decision maker with respect to Sadare's termination or Bosch's decisions around Sadare's immigration status. Consequently, the Court finds Bosch's reliance on Knapp and Kempin's supervisory status, which Bosch has not linked to the redacted information, insufficient to support its

assertion of the privilege. As for the "circle of common interest" argument, Bosch cites no case applying that test in this District or the Eighth Circuit. The Court therefore considers whether Bosch has met its burden of showing that the *Diversified* requirements apply to the emails at issue. *See Ewald*, 2014 WL 1309095, at *7.

### 1.     October 26, 2016 email

The October 26 email is actually a chain of two emails involving Scherwitz, Knapp, and another HR representative Melissa Kaspari. (Dkt. 60-1, Ex. A.) According to Bosch, the redacted portions of the October 26 email:

> surround a discussion between Mr. Knapp and Ms. Scherwitz on October 26, 2016 – the day that Mr. Sadare was informed that BASS would not support an extension of the six-year H-1B period and that the PERM process relative to Mr. Sadare's Green Card failed, as BASS located at least one minimally-qualified U.S. citizen/U.S Permanent Resident. The redacted portion from Mr. Knapp refers to "one of the earlier discussions" where immigration topics were discussed and reveals privileged communications provided to BASS by its external Immigration Counsel, Fragomen.

(Dkt. 62 at 14; *see also id.* at 18 (stating that Knapp asked a question referencing an earlier discussion involving legal advice provided by outside immigration counsel).)

As to the October 26 email, the Court notes that Bosch's characterization of the redacted portions of the email is much broader than the redacted content. That content constitutes a very narrow question regarding Sadare's immigration status that Knapp asked of Scherwitz and Kaspari in the first email and Scherwitz answered in the second and final email.

Having carefully considered the October 26 email, the Court finds that Bosch has not met its burden of showing the email's redacted portions meet the *Diversified* test.

16

Bosch offers no evidence (or argument) indicating that Knapp asked his question for the purpose of securing legal advice, at the direction of his corporate superior, or so the corporation could secure legal advice. *See Diversified*, 572 F.2d at 609. Moreover, there is no evidence that the subject of Knapp's question was within the scope of Knapp's duties or that Knapp needed to know the information, particularly when Knapp was not a decision maker as to Sadare's immigration status and when Bosch conceded during the hearing that Knapp would not necessarily be involved in decisions regarding immigration. *See id.* It is true that "corporate officers may communicate privileged matters to lower-level employees, without losing the privilege, so long as the communication is limited to those who act upon the legal advice," *Safco*, 2010 WL 11252007, at *2, and that privileged information can be communicated to employees involved in relevant decision-making, *see Wilson*, 2014 WL 12600838, at *3 (finding that the attorney-client privilege extended to corporation's presentations containing legal advice because the attendees were involved in the decision-making process regarding whether the project should proceed). But given that Scherwitz had already made the decision regarding Sadare's employment and immigration status six days before Knapp asked his question, Bosch has not shown how Knapp did or would "act upon the legal advice" or how he was involved in any decision-making that required him to know the answer to the question he asked in the October 26 email.

Finally, at the hearing, Bosch suggested that the Email Exhibits were privileged even though they were sent after Scherwitz decided to terminate Sadare on October 20, 2016, because Bosch and Sadare were engaged in settlement discussions. But there is

nothing in the October 26 email (or any other evidence) that suggests Knapp sought the requested information so that he could make a decision relating to settlement or make any other decision based on settlement discussions.  Accordingly, the Court grants the Motion as to the October 26 email.[2]

## 2.    December 1, 2016 email

The December 1 email is a four-email chain beginning on November 30, 2016 and ending on December 1, 2016 involving Knapp and Kempin.  (Dkt. 60-4, Ex. E.)  Bosch asserts:

> [The December 1 email] is a communication dated December 1, 2016, between Mr. Kempin and Mr. Knapp that was a response by Mr. Knapp to an email from Mr. Kempin asking whether there is "anything new on the labor law front." (Mr. Kempin's email was not provided as part of Exhibit E to the Motion).  This response to a request for "anything new on the labor law front" by Mr. Kempin seeks information that was provided to BASS from counsel and clearly involves a discussion of legal advice between Mr. Kempin and Mr. Knapp.

(Dkt. 62 at 15; *see also id.* at 19 (arguing "email clearly involves a discussion of legal advice between Mr. Kempin and Mr. Knapp").)

This argument does not persuade the Court that the December 1 email is privileged because the question is not simply whether the email "involves a discussion of legal advice."  Rather, the question is whether Bosch has met its burden to show the elements of the *Diversified* test are met.

---

[2]    Given the overlap between the redacted content of the October 26 email and the bullet points communicated to Sadare at the meeting in question, the Court questions whether the redacted content actually constitutes legal advice, and if it does, whether Bosch waived any privilege by conveying that information to Sadare and not redacting the middle email.  But the Court need not reach those issues.

Bosch suggests that the redacted portion, which is in an email responding to a question as to whether there is "anything new on the labor law front," is privileged. Having reviewed the redacted portion, it is apparent that it does not contain legal advice. To the extent it contains information about Sadare's conduct in its first sentence, it is clearly not legal advice because Sadare would have been aware of the conduct at issue. To the extent it contains Knapp's description of Sadare's conduct in the same sentence, his description is not legal advice (and nothing indicates he was conveying counsel's assessment of Sadare's conduct). The remaining two sentences cannot possibly be viewed as legal advice because the first states the timing of a call Knapp has with a non-legal group at Bosch and the second sets a date for a follow-up discussion with Kempin. Further, to the extent Bosch contends the redacted portion of the December 1 email is privileged because Sadare and Bosch were engaged in settlement discussions, Bosch has made no showing of why Knapp and Kempin both were in a need-to-know position as to those discussions or that they were in any position to take any action based on them. The Court grants the Motion insofar as it seeks production of the December 1 email.

### 3. December 7, 2016 email

The December 7 email is an email chain beginning on December 7, 2016 when Kempin indicated he would not be attending a meeting scheduled for December 9, 2016, resulting in communications between Knapp and Kempin in anticipation of that meeting. (Dkt. 60-3, Ex. D.) Bosch asserts the December 7 email "is a communication between Mr. Knapp and Mr. Kempin conveying information received by BASS Human Resources

from external counsel, Fragomen, concerning Mr. Sadare's immigration status, including the January expiration of Mr. Sadare's six-year H-1B term."  (Dkt. 62 at 15.)

First, given that Bosch's HR team, specifically Scherwitz and Kaspari, informed Sadare at the October 26, 2016 meeting that his "current visa is expiring at January, 21st 2017 [sic]" and failed to redact that communication when it produced the October 26 email (Dkt. 601, Ex. A at 1), the Court does not comprehend how Bosch can argue in good faith that Knapp telling Kempin of "the January expiration of Mr. Sadare's six-year H-1B term" over a month later could possibly be privileged (or if privileged, how the privilege was not waived).  Further, for the reasons set forth in Section III.B.1 with respect to the October 26 email, Bosch has not made any showing that the December 7 email meets the *Diversified* test, including that Knapp and Kempin needed to know the details of Sadare's immigration status or were involved in any decision-making about it. Bosch also has not made any showing that the redacted portions of the December 7 email have any relation to settlement discussions.  Accordingly, the Court grants the Motion insofar as it seeks production of the December 7 email.

## IV.   ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.   Plaintiff's Motion to Compel Discovery (Dkt. 56) is **GRANTED**.

2.   Defendants Bosch Automotive Service Solutions Inc., Bosch Automotive Service Solutions, LLC; Robert Bosch LLC; and Robert Bosch North America Corporation shall produce unredacted copies of Docket Numbers

60-1, Ex. A; 60-3, Ex. D; and 60-5, Ex. E) on or before **October 8, 2021**,

unless Defendants file objections to this Order.


DATED: September 23, 2021                    *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge