## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ADEBOWALE SADARE, | Case No. 19-CV-3083 (NEB/ECW) |
| Plaintiff, | |
| v. | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| BOSCH AUTOMOTIVE SERVICE SOLUTIONS INC., BOSCH AUTOMOTIVE SERVICE SOLUTIONS LLC, ROBERT BOSCH LLC, and ROBERT BOSCH NORTH AMERICA CORPORATION, | |
| Defendants. | |

Plaintiff Adebowale Sadare sued his employer, Bosch, alleging discrimination, retaliation, and failure to accommodate under the Minnesota Human Rights Act ("MHRA") and the Americans with Disabilities Act ("ADA"). (ECF No. 1 ¶¶ 69–119.) The Court now considers Sadare's motion for partial summary judgment on the claims for failure to accommodate and Bosch's motion for summary judgment on all claims. For the reasons below, the Court denies both motions.

## BACKGROUND

### I.      Factual History

Sadare began working as a product manager for Bosch in February 2014. (ECF No. 84-1 ("Scherwitz Decl.") ¶ 5.) In connection with this employment, Bosch sponsored Sadare's H-1B visa. (*Id.* ¶ 6.)

In his early years at Bosch, Sadare's managers gave him positive reviews. One said Sadare "has business acumen that is geared to results." (ECF No. 77-42 at 2.) In particular, the manager highlighted Sadare's oral and written communication, customer support, analytical and organizational ability, and teamwork. (*Id.* at 4.) Sadare received "within expectations" ratings in "social competence," "entrepreneurial mindset," and leadership. (*Id.* at 2.) Sadare increased revenue by 30% between 2013 and 2015, in part because he negotiated significant price reductions from suppliers. (ECF No. 77-43 at 7.) Sadare also recruited a new client to Bosch and was instrumental in an important project with Safelite AutoGlass. (ECF Nos. 77-84 at 17–18 (Sadare's unemployment hearing testimony about Mercedes-Benz and Safelight projects); *see* ECF Nos. 77-45, 77-46, 77-47 ("[W]e wouldn't be here if it wasn't for you.").) In 2016, this success earned Sadare a bonus. (ECF No. 77-1 ("Sadare I") at 12 (native pagination).)

*Disabilities.* Sadare suffers from epilepsy, narcolepsy, and hypersomnia. (ECF No. 78-1 ("Damergis Dep.") at 8 (native pagination) (filed under seal); ECF No. 77-90 at 1.) Narcolepsy is a sleep disorder treated by adequate sleep and stimulant medications.

(Damergis Dep. at 9–10; ECF No. 77-90 at 2–3.) Hypersomnia is a neurological disorder of excessive sleepiness often accompanied by a lack of alertness. (ECF No. 77-90 at 3.) Epilepsy is a neurological disorder that causes seizures. (ECF No. 78-2 at 9–10 (native pagination) (filed under seal).)

For most of his tenure at Bosch, Sadare did not tell his supervisors about these conditions. (Sadare I at 66–67 (explaining that Sadare disclosed his disability because he was placed on a Performance Improvement Plan).) Sadare's doctors wrote accommodation letters for him, including one in June 2015 and one in May 2016, but Sadare did not provide them to Bosch. (ECF No. 85-3 at 289, 293 (filed under seal).)

*Performance Improvement Plan.* In August 2016—just a few months after he earned his bonus—Bosch placed Sadare on a Performance Improvement Plan to address deficiencies in his work performance. (ECF No. 85-4 at 287–88 ("PIP") (filed under seal).) The PIP required Sadare to work on reliability and accuracy. (*Id.* at 287.) It identified that his team felt he did not meet commitments, and that he was late to important conference calls or missed them entirely. (*Id.*)

The PIP included several deadlines for specific tasks, to be overseen by Thomas Knapp, Sadare's disciplinary supervisor, and others. (*Id.* at 278–88; ECF No. 77-5 ("Scherwitz Dep.") at 61 (native pagination).) On August 19, Sadare signed the PIP but wrote, "This document is signed under protest. I believe this action is due to my disability." (PIP at 288.) This note was the first time Sadare notified Bosch of his disability.

(Sadare I at 66–67 (mistakenly identifying August 18 as the date the PIP was signed).) Indeed, several symptoms of Sadare's condition—poor focus, poor concentration, memory lapses, tiredness, lack of energy, and organizational challenges—are related to the deficiencies in the PIP. (*Compare* Damergis Dep., passim, *with* PIP.) But Bosch did not know of Sadare's disabilities until Sadare commented on the PIP. (Sadare I at 66–67.)

*Request for disclosure.* After Sadare signed the PIP "under protest," a Bosch human resources representative emailed Sadare asking him to describe his disabilities so Bosch could "work with [him] to determine an accommodation." (ECF No. 77-12 at 3.) Sadare did not respond immediately to the first email, so HR sent a follow-up a week later. (*Id.*) Sadare then responded, explaining that he planned to have more information for Bosch soon. (*Id.* at 2.) On October 3, Sadare replied to say that documentation was mailed to Bosch. (*Id.* at 1.)

*September 27 letter.* By "documentation," Sadare was referring to a settlement letter from his lawyer, which was sent via email and U.S. mail to Bosch on September 27.[1] (ECF No. 77-70.) The letter has a header identifying it as a "Confidential Settlement Communication." (*Id.* at 3.) Though the letter states on the one hand that "Sadare has no desire to initiate litigation," it also makes lengthy legal arguments, asserts that "Bosch

---

[1] This settlement letter is admissible. Rule 408 of the Federal Rules of Evidence prohibits consideration of settlement offers and negotiations "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement." But settlement negotiations are admissible for other purposes, in this case, as a request for an accommodation and evidence of the ADA's interactive process.

faces significant damages exposure," proposes a resolution that includes reimbursement of Sadare's legal expenses, and states that Sadare is "fully committed to litigating this matter through judgment." (*Id.* at 3, 12, 16.)

As for an accommodation, the letter requests: (1) that "Bosch must honor Mr. Sadare's medical appointments and not punish or criticize him for going to them"; (2) that "Bosch employees and managers must refrain from unprofessional, demeaning, and harassing comments regarding Mr. Sadare"; and (3) that "Bosch must recognize that Mr. Sadare's expressions of lower energy, interest, or concentration do not necessarily indicate any form of lack of commitment, productivity, or performance." (*Id.* at 16.)

*October 5 meeting.* On October 5, Sadare met with HR to discuss the status of the PIP.[2] (ECF No. 77-79 ("Oct. 5 Trans.").) Knapp and Human Resources Director Bonnie Scherwitz explained to Sadare that the PIP was just the first step in Bosch's progressive discipline policy. (*Id.* at 4, 23–24; PIP.) Knapp told Sadare that his performance was improving, and no one suggested that Sadare's progress on the PIP was inadequate. (*See generally* Oct. 5 Trans. at 31–32, 41.)

Scherwitz also asked Sadare to disclose his disability and to make a request for a reasonable accommodation. (*Id.* at 45–46.) Sadare explained that he thought the letter

---

[2] Sadare recorded this meeting without Bosch's permission. (*See* Scherwitz Decl. ¶¶ 24–25.)

from his lawyer was a disclosure. (*Id.* at 46–47.) Scherwitz told Sadare that the letter did not fully explain what accommodation was needed and why. (*Id.*)

Sadare followed up with Scherwitz over email that same day. In her reply, Scherwitz explained that Bosch needs a doctor's note on his disability and what accommodations he was requesting. (ECF No. 77-13.) On October 19, Sadare replied to explain that he will not see his doctor until December, so it will take a few months to get the requested note. (*Id.*) Scherwitz did not object to that timeline. (*Id.*)

Around the same time, Sadare received a third accommodation letter from a physician's assistant. (ECF No. 88-12.) According to Sadare, he did not provide this letter to Bosch because Bosch requested a letter from a doctor, not a physician's assistant. (ECF No. 85-5 at 293–96 (filed under seal).)

*October 19 letter.* In mid-October, Sadare's attorney sent a second letter, also identified as a settlement letter, asking for follow-up on the September letter and reiterating that Sadare "remains committed to his employment with Bosch."[3] (ECF No. 63-13 at 2.) But again, the letter threatened litigation, stating that Sadare would "have no choice but to initiate [a] charge of discrimination with the Minnesota Department of

---

[3] The letter's admissibility is not barred by Rule 408 because it is not offered for the purposes covered in the rule.

Human Rights and the Equal Employment Opportunity Commission" if he did not hear back within one week.[4] (*Id.*)

*Termination decision.* Around the same time, Scherwitz was contemplating terminating Sadare. (Scherwitz Dep. at 57.) On October 20—just one day after Sadare's attorney sent the letter—Scherwitz decided to terminate him. (*Id.*) She did not discuss this decision with Sadare's managers. Instead, she testified that she decided to terminate Sadare because he was unwilling to engage with the PIP process and because of poor performance. (*Id.* at 57–60.) Scherwitz admits that this deviates from normal process: typically, she would consult an employee's managers and the manager would make the decision. (*Id.* at 62–64.) And in making the decision, Scherwitz did not follow the company's progressive discipline policy. (*Id.*)

*H-1B sponsorship.* A little more than a week later, Sadare met with Scherwitz to discuss his immigration status. In September, Bosch had told Sadare it was pursuing an

---

[4] In its brief and at the hearing, Bosch explained that Sadare and Bosch were engaged in settlement negotiations from this letter until Sadare's termination in December. (ECF No. 97 at 22, 40.) Bosch asserts that Sadare wanted severance, not ongoing employment with Bosch. (*Id.* at 24.) But Bosch does not cite any admissible evidence to support this contention. Before the Court is a November 22 email from Sadare's previous attorney, Darren Sharp, to Bosch's attorney. (ECF No. 95-3 (filed under seal).) This letter does not support Bosch's position. Sharp states that Sadare planned to resign in January 2017 if Bosch accepted the settlement offer, but this follows Bosch's prior decision to terminate Sadare's H-1B application, and so it does not suggest Sadare wanted to end his employment. In fact, Sharp states that Sadare would be willing to transfer within Bosch. (*Id.* (offering to resign effective in January 2017); *see* Scherwitz Decl. ¶ 38 (specifying that Sadare's visa would expire in January 2017).)

H-1B visa extension. (ECF No. 77-33.) At that meeting, Scherwitz informed Sadare that Bosch would not sponsor his H-1B visa past January 2017—when it was set to expire—and would not sponsor his attempt to gain permanent residency. (Scherwitz Decl. ¶¶ 31–35, 38.) Scherwitz also told Sadare that his employment would not be extended for "immigration reasons"; she did not mention any performance problems. (Scherwitz Dep. at 67.) In fact, neither she nor Knapp mentioned to Sadare that he failed to complete the PIP, though Scherwitz says she determined that Sadare failed the PIP in October. (*Id.* at 70–72.) The inference the Court draws is that Scherwitz decided in October to terminate Sadare for performance problems, but then told Sadare that his visa would not be renewed for immigration reasons.

*Doctor's letter.* On November 3—less than one month after Bosch requested a doctor's note—Sadare responded with a letter from his neurologist. (ECF No. 78-3 (filed under seal).) Sadare's doctor recommended four accommodations: (1) a "start time no earlier than 9am"; (2) "[t]wo dedicated rest sessions per day, 30 minutes in duration"; (3) no "overnight phone calls and work requirements"; and (4) "[t]elecommuting options." (*Id.* at 5.) Bosch admits that it could have accommodated at least some of these requests. (*See* ECF No. 77-83 at 4, 6, 19 (Marc Rosone, Bosch's Director of Product Management, and one of Sadare's managers, explaining that late night calls were not a job responsibility, though they did happen, that two 30-minute breaks would be possible, and that flexible work arrangements were possible).)

*December performance review.* On December 1, Knapp emailed Marco Kempin—another one of Sadare's managers. (ECF No. 77-73; Scherwitz Dep. at 164.) Knapp asked Kempin to give Sadare a performance review.[5] (ECF No. 77-73; ECF No. 81 at 34.) Kempin responded to say Sadare's performance had not improved and that he still needed constant attention. (ECF No. 77-73.) When asked why Kempin would give Sadare a performance review after she had decided to terminate him, Scherwitz said it was "just to have documentation." (Scherwitz Dep. at 165.)

*Termination.* Sadare kept working at Bosch until he was terminated on December 22, 2016—almost a month before his visa expired, and ostensibly for performance problems. (ECF Nos. 77-74; 77-75.) Nothing in the record suggests that these performance problems differed from the ones identified the PIP—lack of concentration, inattention, lateness, and not meeting commitments. (PIP.) Many of these "performance problems" overlap with the symptoms of his conditions. (*See* Damergis Dep., *passim*.) And Sadare explained as much when he requested accommodations. (*See* ECF No. 77-70 at 6 (describing symptoms of narcolepsy and epilepsy).)

The comments on the termination form explain that Sadare's termination was involuntary. (ECF No. 77-74.) At first, the reason stated on the termination form was "Fighting on co property," but that was corrected about two weeks later to "inability to perform job." (Scherwitz Dep. at 187, 190.) No party suggests that Sadare fought on

---

[5] The email is in German. For this motion, the Court accepts Sadare's translation.

9

company property; that selection appears to have been a clerical error. (*See id.* at 187.) A question of fact remains about whether Sadare's managers knew he was being terminated. (ECF No. 77-75; Scherwitz Dep. at 189.)

## II.   Claims

Sadare now asserts that Bosch discriminated against him on the basis of disability. He raises six claims: (1) failure-to-accommodate claims under the ADA and the MHRA; (2) disability discrimination claims under the ADA and the MHRA; and (3) a retaliation claim under the ADA and a reprisal claim under the MHRA.

## ANALYSIS

## I.   Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (citation omitted). "A

complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322–23).

On cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and the record in the light most favorable to the defendant when considering the plaintiff's motion. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

## II.    Adverse Employment Action

All of Sadare's claims require that he prove an adverse employment action. Sadare asserts that he faced two such actions: First, Bosch's failure to renew his visa, and second, his termination before his visa expired.[6] Because this issue matters for all six claims, the Court addresses it first.

Two standards for "adverse employment action" are relevant here. For failure-to-accommodate and disability discrimination claims, "[a]n adverse employment action is one that causes a material change in the terms or conditions of employment." *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 716 (8th Cir. 2003) (citation omitted). Second, for a retaliation claim, the test is whether "a reasonable employee would have found the

---

[6] The Court need not consider whether withdrawing Sadare's permanent residency application was an adverse employment action because it does not affect the analysis. Bosch decided not to renew his visa at the same time and to similar effect: Sadare's employment with Bosch would be shorter than planned.

challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *AuBuchon v. Geithner*, 743 F.3d 638, 642 (8th Cir. 2014) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

In the context of visa sponsorship, the relevant inquiry under both tests is whether the employer withdrew an expected sponsorship, making the employer's action effectively a termination. *Compare Cordova v. R&A Oysters, Inc.*, 169 F. Supp. 3d 1288, 1294–95 & n.7 (S.D. Ala. 2016) (comparing revocation of a promised visa sponsorship to termination of a contract or withdrawal of an offer of employment), *with Samuel v. Metro. Pol. Dep't*, 258 F. Supp. 3d 27, 35–36 (D.D.C. 2017) (finding no adverse employment action when the employee was terminated because her visa had expired).

This case meets that standard: the decision not to renew Sadare's visa was a decision to terminate Sadare. Until October 2016, Bosch planned to continue to employ Sadare after January 2017. In October, Scherwitz decided not to renew Sadare's visa because Bosch no longer planned to employ Sadare after January 2017—effectively terminating Sadare. *See Pryce v. Bd. of Educ. For Prince George's Cnty.*, No. CV DKC 2007-3284, 2009 WL 10681228, *5 (D. Md. 2009) (finding loss of work authorization caused by employer's actions was adverse employment action because it caused termination).

This decision materially affected Sadare's employment and "might have dissuaded a reasonable worker from making or supporting a charge of discrimination"

because it was effectively a termination. *Fenney*, 327 F.3d at 716; *AuBuchon*, 743 F.3d at 642 (citation omitted). Thus, both the decision not to renew Sadare's visa and the decision to terminate him before his visa expired were adverse employment actions.

### III.   Counts 5 and 6: Failure to Accommodate

Sadare asserts that Bosch discriminated against him based on a disability in violation of the ADA and the MHRA by failing to accommodate his disability.[7] *See* 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2. To succeed on a reasonable-accommodation claim, Sadare "must establish both a *prima facie* case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). Both parties move for summary judgment on this claim.

### A.   *Prima Facie Case*

First, Sadare must show that he "(1) is disabled within the meaning of the statute; (2) is qualified to perform the essential functions of the job (either with or without reasonable accommodation); and (3) has suffered an adverse employment decision because of the disability." *Id.* (quoting *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012)). The parties agree that Sadare has epilepsy and narcolepsy and

---

[7] Cases under the ADA and MHRA are analyzed under the same standard. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).

that they are disabilities under the ADA and MHRA. And as discussed above, Sadare

suffered an adverse employment action.[8]

Bosch asserts that it cannot be liable for discrimination because Sadare could not

fulfil the essential function of the job. As evidence, Bosch cites Sadare's admission to his

physicians that he had performance problems at work. (ECF No. 87 at 30.)

Sadare's performance problems do not necessarily make him unqualified. "An

individual is qualified if he satisfies the requisite skill, experience, education, and other

job-related requirements and 'can perform the essential job functions, with or without

reasonable accommodation.'" *Otto v. City of Victoria*, 834 F. Supp. 2d 912, 916 (D. Minn.

2011) (citing *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007)). Sadare is qualified by

requisite skill, experience, and education—Bosch employed him in this role for several

years, Sadare received a bonus just a few months before the PIP, and nothing changed

about his qualifications in the time preceding his termination.[9]

---

[8] At times Bosch seems to suggest that the PIP is the adverse employment action Sadare complains of. Bosch correctly notes that the PIP could not be disability discrimination because Sadare's supervisors and the Bosch decision-makers only learned of his disability through the PIP. (ECF No. 97 at 29.)

[9] Bosch's argument that Sadare failed to control a controllable disability is not supported by the record. An employee fails to control a controllable disability "when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet the employer's legitimate job expectations, due to his failure to control a disability." *Boroughs v. City of Springfield*, 163 F.3d 505, 509 (8th Cir. 1998) (quotation marks and citation omitted). To the extent that Bosch seeks a finding that Sadare failed to follow his doctor's treatment plan by not providing it with accommodation letters, this would show that Sadare did need an accommodation for his disability. And though

Nor has Bosch met its burden to identify an essential job duty that Sadare could not perform. *Id.* at 916. In fact, Bosch has identified no essential job duties for this position.[10] Instead, it makes generalized assertions that Sadare was not meeting expectations, yet offers no examples. Thus, Sadare has stated a *prima facie* case for disability discrimination.

**B.     ADA Reasonable Accommodation**

To prevail on the ADA failure-to-accommodate claim, Sadare must also show that Bosch "knew of, and failed to reasonably accommodate, his disability." *Kammueller*, 383 F.3d at 784. To determine what accommodations are necessary and reasonable, Bosch and Sadare should have engaged in an "interactive process." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999). An employer will not be liable for failure to engage in the interactive process if no reasonable accommodation was possible, but on a motion for summary judgment, failure to engage in the interactive process is *prima facie* evidence of bad faith. *Id.* To establish that Bosch failed to participate in an interactive process, Sadare must show that: (1) Bosch knew about Sadare's disability; (2) Sadare requested

---

Sadare did stop taking his medications for a short period, the record suggests that Sadare's pharmacy caused the error. (ECF No. 89-6 (sealed exhibit).)

[10] Bosch asks the Court to find that Sadare was not qualified because the behaviors described in the PIP are "classic symptoms" of his disability. But Bosch presents no evidence to suggest that the PIP identified that Sadare failed to meet the essential functions of his job. In fact, the PIP suggests that Bosch believed Sadare could improve and meet these functions. (PIP.)

accommodation or assistance for his disability; (3) Bosch did not make a good faith effort to help Sadare seek accommodation; and (4) Sadare could have been reasonably accommodated but for Bosch's lack of good faith. *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000).

Bosch learned the details of Sadare's disability when Sadare's attorney requested accommodations on his behalf in September. Sadare's attorney sent a letter, which included some requested accommodations, not all of which were reasonable. *See Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1123 (D. Minn. 2011) ("[T]here exists no authority for the proposition that cessation of harassment is a required reasonable accommodation.") (quotation marks and citation omitted); *Cannice v. N.W. Bank Iowa N.A.*, 189 F.3d 723, 728 (8th Cir. 1999) ("We do not believe . . . that the obligation to make reasonable accommodation extends to providing an aggravation-free environment."). But that does not excuse Bosch's obligation "to initiate an interactive process with [Sadare] to determine the appropriate reasonable accommodation." *Fjellestad*, 188 F.3d at 952.

At first, Bosch and Sadare engaged in the interactive process, though not as quickly or clearly as the other may have liked. Bosch requested disclosure and Sadare's accommodation requests, and Sadare worked to provide exactly what Bosch requested— a note from his doctor. Both Bosch and Sadare contributed to delays in this process. After Sadare notified Bosch that he had a disability on August 19, Bosch took a month to ask

16

Sadare for his disclosure and accommodation requests. After that, Sadare took nearly a month to provide a note. At some point, this process broke down.

A question of fact exists about who caused the interactive process to break down. If Sadare caused the breakdown in the interactive process, Bosch cannot be liable. *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005) (holding that employer was not liable when employee failed to provide a doctor's note or schedule a doctor's appointment). Bosch points to the fact that Sadare had other notes, one from a physician's assistant, and several previous notes from other doctors, as evidence of Sadare's bad faith. Though it would have been wise for Sadare to provide those notes, he also explains why he did not: he was attempting to comply with Bosch's request that the note come from his doctor. Thus, a question of fact exists about whether Sadare failed to provide doctor's notes because he was acting in bad faith or because he was working to meet Bosch's expectations. In any event, because Bosch did not know about the letters at the time, they have no bearing on whether Bosch was acting in good faith.

A question of fact also exists about whether Bosch acted in bad faith. After a delay, Sadare requested reasonable accommodations on November 3. Bosch did not engage with Sadare about this accommodation request,[11] and did not consider whether these accommodations would improve his performance. Instead, Bosch concluded that the

---

[11] At the hearing and in its brief, Bosch explained that it did not engage because Sadare was also seeking severance. Bosch cited no admissible evidence of this, so the Court cannot consider it.

accommodation request came too late—after the interactive process broke down due to Sadare's delay. A jury must decide whether Sadare or Bosch caused the interactive process to break down by acting in bad faith. *Cf. Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 899, 902-03 (8th Cir. 2006) (holding that a jury properly considered employer's good faith when evidence showed the employer stopped discussing reasonable accommodations, did not investigate the employee's abilities, and did not discuss options with a manger).

Finally, the record suggests that had the parties engaged in the interactive process in good faith, Sadare could have been accommodated. Bosch apparently concedes that the November 3 accommodations were reasonable, arguing instead that Sadare acted in bad faith before this point and that this letter came too late. (ECF No. 87 at 19–20.) And Sadare's manager explained that at least some of those accommodations were possible. (ECF No. 77-83 at 19.) Thus, if Bosch did act in bad faith, Sadare has shown that he could have been accommodated but for Bosch's bad faith. *Fjellestad*, 188 F.3d at 952.

The Court denies both Sadare and Bosch's motions for summary judgment on the ADA reasonable-accommodation claim.

### C.     *MHRA Reasonable Accommodation Claim*

An interactive process was not required under the MHRA when Sadare was terminated. *McBee v. Team Indus., Inc.*, 925 N.W.2d 222, 229 (Minn. 2019). Instead, Bosch needed to "make reasonable accommodation to the known disability of a qualified

disabled person . . . unless the employer . . . can demonstrate that the accommodation would impose an undue hardship." *Id.* at 229 (citing Minn. Stat. § 363A.08, subdiv. 6(a)). Bosch argues that the accommodations in Sadare's September 27 letter would pose an undue hardship because they are unreasonable. At that point, the MHRA imposes a good-faith standard: "In determining whether an accommodation would impose an undue hardship[,] . . . factors to be considered include . . . documented good faith efforts to explore less restrictive or less expensive alternatives, including consultation with the disabled person or with knowledgeable disabled persons or organizations." Minn. Stat. § 363A.08, subdiv. 6(b)(5). Thus, "an employer may avoid communicating with an employee seeking accommodation at its own peril." *McBee*, 925 N.W.2d at 229 n.4. As discussed in connection with the ADA claim, a question of fact remains concerning whether Bosch acted in good faith, so the Court denies both motions for summary judgment on this claim.

## IV.   Disability Discrimination

Sadare asserts that Bosch discriminated against him based on his disability in violation of the MHRA and the ADA. Under the MHRA and the ADA, disability claims are reviewed through the *McDonnell Douglas* burden-shifting framework. *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998). Sadare must make out a *prima facie* case of discrimination by showing that (1) he was disabled; (2) he was qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) he

suffered an adverse employment action because of his disability—here, his termination. *Id.* If he does, the burden shifts to Bosch to show it had a legitimate nondiscriminatory reason for termination. *Id.* at 872–73. Then, the burden returns to Sadare to show that reason was pretextual. *Id.* at 873. Ultimately, Sadare must show that "discrimination was the real reason for the employer's actions." *Id.*

Sadare has stated a *prima facie* case. As discussed above, he was disabled and could perform the essential functions of the job. And Sadare was replaced by a non-disabled person. (ECF No. 77-82 at 22–23.) Bosch has stated a legitimate reason for termination: that Sadare was not performing to its expectations.

So the question is whether Sadare has presented evidence to show that Bosch's reasons were pretext for discrimination. To survive summary judgment, Sadare "need not definitively prove that [his] employer's reason for firing [him] was pretextual—rather, [he] simply must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021) (citation omitted). There are at least two ways to show pretext: (1) "by showing the proffered explanation has no basis in fact," or (2) by persuading "the court that a prohibited reason more likely motivated the employer." *Id.* (citation omitted). At all times, the central inquiry is whether Bosch terminated Sadare because he was disabled; Sadare must show that Bosch's stated reasons for terminating him were pretext for

disability discrimination. *See Wilking*, 153 F.3d at 873–74 (highlighting that the stated reason must be pretext for disability discrimination).

Sadare presents ample evidence that Bosch's reasons for terminating him were pretextual, and a factfinder could connect that evidence to disability discrimination. First, to show pretext, Sadare has shown that Bosch's stated reason for termination is not worthy of credence—Scherwitz determined he could not improve while Knapp told Sadare he was improving.[12] *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) ("A plaintiff may show that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact.'") (citation omitted). Second, Bosch failed to follow its own progressive discipline policy, and Scherwitz inexplicably decided to terminate Sadare without consulting with Sadare's managers. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (holding that an employee can show pretext "by showing that an employer . . . failed to follow its own policies"). Third, the record before the Court reveals shifting reasons for termination—at first Scherwitz said it was for immigration reasons, then performance problems. *See id.* (holding that an employee can show pretext by an employer's shifting "explanation of the employment decision").

The trickier issue is whether the evidence of pretext supports an inference of discrimination. Sometimes a factfinder can infer pretext for discrimination from the

---

[12] In fact, when Sadare was eventually terminated in December, Knapp seemed confused about why.

timing of events. *Hairston*, 6 F.4th at 843–44. But here, Bosch documented performance problems before Sadare disclosed his disability, which weakens any causal connection between the disclosure and his termination. *See Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001). Sadare disclosed his disability first on August 19 and then in more detail on September 27. After both disclosures, Bosch reached out to work with Sadare in the interactive process, so timing alone does not establish pretext.

But a factfinder could infer pretext for discrimination from Bosch's stated reason for termination: performance problems that overlapped with symptoms of Sadare's disability. Under the ADA, an employer may not hold an employee with a disability "to precisely the same standards of conduct as a non-disabled employee unless such standards are job-related and consistent with business necessity." *See Walz v. Ameriprise Fin., Inc.*, 22 F. Supp. 3d 981, 986 (D. Minn. 2014) (citing *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997)). This does not mean that an employer must tolerate poor performance or misconduct, but the employer must try to make accommodations, and if the employee can perform the essential functions of the job, the employer "must tolerate eccentric or unusual conduct." *Den Hartog*, 129 F.3d at 1088.

Sadare received no accommodation, and a question of fact remains about whether Bosch determined that Sadare could not satisfactorily perform the essential functions of his job. Thus, a factfinder could conclude that Bosch terminated Sadare because of the symptoms of his disability, even though he was meeting essential job functions or could

do so with accommodations. In other words, a jury could find that Bosch terminated Sadare because of his disability. Thus, the Court denies summary judgment to Bosch on these claims.

### V.      Retaliation and Reprisal

Finally, Sadare asserts that Bosch retaliated against him for seeking an accommodation in violation of the ADA and the MHRA. The ADA prohibits an employer from discriminating against an employee because the employee "opposed any act or practice made unlawful by [the ADA] or because [the employee] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" conducted under the ADA. 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation, Sadare must establish that (1) he engaged in statutorily protected activity; (2) a materially adverse action was taken against him; and (3) a causal connection existed between the two events.[13] *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (describing *prima facie* case for retaliation). If Sadare establishes a *prima facie* case, the burden shifts to Bosch to show a legitimate, non-retaliatory reason for the action.

---

[13] The elements are the same under the MHRA. *See Heisler v. Metro. Council*, 339 F.3d 622, 632 n.6 (8th Cir. 2003).

*Eldredge v. City of St. Paul*, 809 F. Supp. 2d 1011, 1035–36 (D. Minn. 2011). If it does, the burden shifts back to Sadare to show the stated reason was pretextual. *Id.* at 1036.

   *First*, Sadare engaged in a protected activity by disclosing his disability and by requesting an accommodation. The requests are protected even if the requested accommodations are not reasonable, so the September 27 letter is a protected activity, as is the October 19 letter from Sadare's attorney. *See Heisler*, 339 F.3d at 632 (holding that an employee may pursue a retaliation claim under the ADA "as long as [he] had a good faith belief that the requested accommodation was appropriate," and extending the analysis to an MHRA claim). *Second*, Sadare experienced two materially adverse employment actions: his visa was not renewed, and he was terminated. *Third*, Scherwitz decided not to renew his visa just one day after his attorney sent the second letter. This temporal proximity is sufficient evidence of causation for the *prima facie* case. *See Hairston*, 6 F.4th at 844 (finding evidence of causation when several days passed between protected activity and termination). Then, Bosch stated a legitimate nondiscriminatory reason, as discussed above.

   Thus, the issue is whether Sadare presented sufficient evidence for a jury to find Bosch terminated Sadare in retaliation for his request for an accommodation. The Court finds that he has. On top of the ample evidence of pretext discussed above, Sadare's retaliation claim is supported by an inference of wrongful purpose based on timing. *See Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 909–10 (8th Cir. 2015) (holding that

there was a genuine dispute of material fact about pretext when five days elapsed between protected activity and termination). Scherwitz decided to not to renew Sadare's visa just one day after his attorney sent a renewed request for accommodations, and just one day after Sadare told her he would send a doctor's note soon. This timing suggests that Bosch did not wish to engage in the interactive process and terminated Sadare for his request to do so. The inference is strengthened because Bosch continually declined to participate in the interactive process in the months after Sadare's second letter—it tends to show that Sadare's request to engage in the interactive process was a problem for Bosch.

Bosch is not insulated from liability because it documented Sadare prior performance problems. When "an employer has known about its stated reason for taking adverse action against an employee 'for an extended period of time,' but only acts after the employee engages in protected activity, the employer's earlier inaction supports an inference of pretext." *Id.* at 910 (citation omitted). Since a jury could find that Bosch terminated Sadare because he requested an accommodation, the Court denies Bosch's motion for summary judgment on the retaliation and reprisal claims.

## VI.    Damages and Defenses

Bosch asserts that even if Sadare could prevail on his claims, Sadare's damages should be limited for three reasons: (1) the after-acquired evidence doctrine; (2) no

evidence supports emotional damages; and (3) the doctrine of unclean hands. For the reasons below, the Court will not limit Sadare's recovery on this motion.

### A.    After-Acquired Evidence

Bosch contends that Sadare's recovery on all claims is barred by the after-acquired-evidence doctrine because Sadare recorded the October 5 phone call in violation of company policy. In doing so, Bosch asks this Court to deviate from the Supreme Court's *McKennon* rule that backpay is recoverable up to the date Bosch discovered Sadare's wrongdoing.[14] Bosch seeks a total bar on recovery of backpay, a rule which the Supreme Court held "would undermine" the objectives of anti-discrimination statutes. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995). This Court will not find that a possible violation of an employer's recording policy is an acceptable reason to deviate from Supreme Court precedent.

And Bosch has not met its burden to show that the after-acquired evidence doctrine applies because "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone." *Id*. at 362–63. This Court "must look to the employer's actual employment practices and not merely the standards

---

[14] Bosch also presents a conundrum: what would happen if the employee had not proved the employer's wrongdoing, but the employee violated company policy? (ECF No. 97 at 42.) When an employee has not proven wrongdoing by his employer, the employer is not liable. The Court finds no reason to apply the after-acquired evidence doctrine to limit recovery if there is no liability.

articulated in its employment manuals." *Sellers v. Mineta*, 358 F.3d 1058, 1064 (8th Cir. 2004).

Bosch's company handbook prohibits unauthorized recordings and directs employees to site-specific polices. (ECF No. 77-28 at 21.) By its own terms, the policy is to protect employee privacy, security, and trade secrets. (*Id.*) Because Sadare recorded his own PIP meeting, the general reasons for the policy do not seem to be implicated by his actions. Still, Scherwitz stated that she would have terminated Sadare for recording the October 5 call, had she known about it. (Scherwitz Decl. ¶ 27.) The handbook and Scherwitz's declaration cannot show an established company policy on a motion for summary judgment, a jury must determine whether Bosch would have terminated Sadare had it discovered his recording. *See Predzik v. Shelter Corp.*, No. 05-CV-1063 (JRT/FLN), 2006 WL 2794368, *5 (D. Minn. Sept. 27, 2006) (citing *Waag v. Thomas Pontiac, Buick, GMC, Inc.*, 930 F. Supp. 393, 408–09 (D. Minn. 1996)). Thus, the Court will not apply the after-acquired evidence doctrine to limit damages.

B.     *Emotional Damages*

Bosch asks this Court to limit Sadare's emotional damages to nominal damages because in two sessions with his psychologist—one the day he was terminated and one about three weeks after—Sadare was generally positive. Sadare told his psychologist he was "moving forward" and his psychologist noted he "seems to be taking getting fired in stride." (ECF No. 85-1 at 82 (filed under seal).) But Sadare also testified that he has

experienced "[s]evere anxiety, severe depression, [and] post traumatic stress" from what was a "major traumatic experience for [him]." (ECF No. 77-1 at 48–49.) "It's impacted [Sadare's] ability to function." (*Id.* at 49.)

Thus, Sadare has presented evidence of "genuine injury" as required; a question of fact exists about the extent of emotional damages attributable to Bosch's conduct. *Foster v. Time Warner Ent. Co.*, 250 F.3d 1189, 1196 (8th Cir. 2001) (citation omitted). A jury should decide the appropriate emotional award. *See Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000) ("[I]t is well settled that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.").

## C.   *Unclean Hands*

Finally, Bosch raises doctrine of unclean hands. Even assuming the unclean-hands doctrine could be invoked,[15] it does not apply. Bosch suggests that Sadare's bad faith during the interactive process supports an unclean-hands defense. Even if Sadare acted in bad faith by not providing notes from his other medical providers, this is not wrongdoing of "serious proportions" which justifies application of the unclean-hands

---

[15] There is doubt about whether the unclean-hands defense applies to ADA claims. *See McKennon*, 513 U.S. at 360 ("We have rejected the unclean hands defense 'where a private suit serves important public purposes.'") (citation omitted). And Bosch did not raise unclean hands as an affirmative defense. (ECF No. 9); s*ee Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 807 (8th Cir. 2013) ("Federal Rule of Civil Procedure 8(c)(1) requires defendants to plead affirmative defenses."); *EEOC v. Prod. Fabricators, Inc.*, 873 F. Supp. 2d 1093, 1100–01 (D. Minn. 2012) (characterizing unclean hands as affirmative defense).

doctrine. *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 344–45 (8th Cir. 2018) (citation omitted); *see also Brown v. Lee*, 859 N.W.2d 836, 843 (Minn. Ct. App. 2015) (holding that under state law, conduct must be "unconscionable" for the unclean-hands doctrine to apply) (citation omitted). Thus, the unclean-hands defense does not bar Sadare's claims.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   Sadare's motion for partial summary judgment (ECF No. 75) is DENIED; and

2.   Bosch's motion for summary judgment (ECF No. 82) is DENIED.


Dated: July 28, 2022                          BY THE COURT:

                                              s/Nancy E. Brasel
                                              Nancy E. Brasel
                                              United States District Judge