UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ADEBOWALE SADARE, | |
| Plaintiff, | |
| v. | Case No. 0:19-cv-03083-NEB-ECW |
| BOSCH AUTOMOTIVE SERVICE SOLUTIONS INC., BOSCH AUTOMOTIVE SERVICE SOLUTIONS, LLC, ROBERT BOSCH LLC, ROBERT BOSCH NORTH AMERICA CORPORATION, | **DEFENDANTS' TRIAL BRIEF** |
| Defendants. | |

_____/

Pursuant to this Court's Order, Defendants submit this trial brief in the above-captioned matter.[1]

A.  **Lead Trial Counsel.**  Andrew H. Stuart, Esq., Stuart & Johnston, LLC 358 Roswell Street NE, Suite 1140, Marietta, Georgia 30060, (404) 216-3497, astuart@stuartandjohnston.com.

B.   **Jury/Non-Jury.** The case is to be tried to a jury.

C.  **Length of Trial.** The Defendants anticipate that the length of trial will be 5 days.

D.  **Jurisdiction.**   The jurisdictional basis for Plaintiff's claims, as stated in Plaintiff's Complaint, is that some of Sadare's claims arise under the Americans with Disabilities Act, 42 USC 12101, *et seq.*

_____

[1] Defendants submit that Sadare was employed by Bosch Automotive Service Solutions, Inc. ("BASS") during all times relevant to this case.

E.     **Summary of Facts Defendants intend to prove at trial.**

## BACKGROUND

## STATEMENT OF FACTS

**A.     Start of Employment with BASS.**

Mr. Sadare's employment at BASS began on February 11, 2014. He signed onboarding paperwork, including handbook receipts in early February 2014.

In connection with Mr. Sadare's employment, BASS agreed to serve as a sponsor for Mr. Sadare's H-1B visa. At the time of hire, the maximum period of authorized admission under the H-1B visa was six years; Mr. Sadare's six-year H-1B period would expire in January 2017. Any extension of the six-year period based on "recapture time" was subject to the review by the INS, now the USCIS.

By the time BASS agreed to sponsor Mr. Sadare's H-1B visa, he had utilized more than three of the maximum six-year H-1B term—He began his employment at Illinois Tool Works ("ITW") in March 2010 and his BASS employment began in February 2014.

**B.     Mr. Sadare's alleged disability and Dr. Damergis' Treatment Plan.**

Mr. Sadare claims that he suffered from a disability during the entirety of his employment at BASS, and that he needed an accommodation that would have permitted him to perform the essential functions of his job. Mr. Sadare received treatment for his alleged disabilities from Dr. Damergis of Noran. Dr. Damergis' treatment plan included medication as well as accommodation letters to his employer and his school.

Dr. Damergis testified at length regarding the importance of Mr. Sadare following his treatment plan. He was advised to keep appointments with Noran, take his medication as directed, and request the recommended accommodations at work, so that he may improve

his job performance. Dr. Damergis made it clear during his deposition that if a patient does not follow a prescribed treatment plan, the likelihood of any improvement of symptoms is highly unlikely. During the relevant time period, Mr. Sadare failed to follow Dr. Damergis' treatment plan.

### C.      The August 19, 2016, Performance Improvement Plan.

Mr. Sadare was placed on a PIP following multiple discussions by BASS concerning his poor performance. The Company held a meeting on August 17, 2016, with the Plaintiff, to discuss these performance issues. Mr. Sadare knew that his performance was poor at the time he was placed on his PIP, and he also recognized that he was subject to termination as a consequence.

After that meeting, on August 19, 2016, Mr. Sadare mentioned, for the first time, he had some, yet-unrevealed disability. Mr. Sadare never breathed a single word about an alleged disability or requested any type of accommodation during the August 17, 2016 meeting. No one at BASS had any idea as to the alleged disability to which Mr. Sadare was referring.

Unbeknownst to the Company at the time, Mr. Sadare actually had two accommodation letters written by Dr. Damergis in his possession prior to the PIP meeting of August 17, 2016. One letter was dated June 26, 2015 ("First Accommodation Letter") and the other was dated May 27, 2016 ("Second Accommodation Letter"). Dr. Damergis provided both of these letters to Mr. Sadare as part of a treatment plan which Dr. Damergis prescribed to increase the likelihood that his symptoms would improve. Part of that treatment plan was to provide the letters to the Company. It is undisputed that Mr. Sadare completely failed to follow this portion of Dr. Damergis' recommendation prior to the

3

August 19, 2016, PIP.

**D.    BASS' Requests for Mr. Sadare to Initiate the Interactive Process Between August 19, 2016, and September 27, 2016.**

It is undisputed that Mr. Sadare did not disclose a disability or either initiate or engage in the interactive process prior to September 15, 2016. After Mr. Sadare was placed a on PIP, Melissa Kaspari, HR Manager at BASS, sent Mr. Sadare two emails, on September 15 and 22, requesting that Mr. Sadare disclose his disability and submit any requested accommodations to the Company.

Mr. Sadare did not disclose a disability or initiate and/or engage in the interactive process in response to either of Ms. Kaspari's emails; nor did he provide either accommodation letter he already had in his possession.

**E.    Mr. Sadare's Confidential Settlement Communication.**

On or about September 27, 2016, BASS received a 15-page confidential settlement letter from Mr. Sadare's counsel, Darren Sharp. To remove any doubt as to the purpose of the letter, it read: "Confidential Settlement Communication Not Admissable [sic] as Evidence."

In this letter, Mr. Sadare first claimed discrimination on the basis of, among other things, Disability, National Origin and Race. The letter also disclosed, for the first time, that Mr. Sadare suffered from Narcolepsy and Epilepsy. One thing was noticeably missing from the letter: any mention of Dr. Damergis' recommended treatment plan for the Plaintiff.

**F.    The October 5, 2016 Meeting with BASS, Mr. Sadare's Third Accommodation Letter from Noran, and Mr. Sadare's Continued Failure to Engage in the Interactive Process.**

On October 5, 2016, several BASS employees, including Thomas Knapp ("Mr.

4

Knapp"), Mr. Sadare's Disciplinary Manager and Ms. Scherwitz met with Mr. Sadare to discuss his performance issues and to again request that Mr. Sadare identify any reasonable accommodations that would allow him to perform the essential functions of his job. Mr. Sadare surreptitiously recorded the 90-minute meeting. During this meeting, both Mr. Knapp and Ms. Scherwitz discussed Mr. Sadare's performance concerns as stated in the PIP and Ms. Scherwitz again asked Mr. Sadare if there was any reasonable accommodation that would help improve his performance moving forward. At no point during the meeting did Mr. Sadare provide either of the accommodation letters, notwithstanding that (1) Dr. Damergis clearly instructed that he do so in connection with his treatment plan; and (2) Ms. Scherwitz specifically asked that he request a reasonable accommodation if he believed he needed one. If Mr. Sadare actually wanted to improve his performance and continue working at BASS as of October 5, 2016, he would have provided the information that was in his possession.

Finally, and perhaps most importantly, on October 4, 2016, just one day prior to the meeting with Ms. Scherwitz and Mr. Knapp, Mr. Sadare had an appointment at Noran with Stephanie Brakel, a Physician Assistant ("P.A. Brakel") At the conclusion of the October 4 meeting, P.A. Brakel, dictated, signed, and delivered a *third* accommodation note (the "Third Accommodation Letter") to Mr. Sadare.[2] Mr. Sadare did not provide the Third Accommodation Letter to anyone at BASS.

To recap, it is undisputed that, as of October 5, 2016:

---

[2]  Mr. Sadare attempted to explain the letter away during his deposition by discounting it because P.A. Brakel was "not a physician." P.A. Brakel testified that she was fully authorized to draft and sign the letter and that she actually did provide the letter to Mr. Sadare on October 4, 2016.

(1)     Mr. Sadare told his doctors the fact that his performance was poor and that he was concerned that he would be terminated;

(2)     That on August 19, 2016, he was placed on a PIP which he knew would expire in 60 days;

(3)     That he had two accommodation letters in his possession prior to his PIP;

(4)     That he received the Third Letter just one day prior to the October 5, 2016 meeting;

(5)     That discussions in the October 5, 2016 meeting included ways Mr. Sadare could improve his performance, including accommodations that Mr. Sadare could request, to allow him to improve his performance; and

(6)     That he never provided any accommodation request to anyone at BASS.

Rather than communicate with BASS in good faith during this meeting or at least feign interest in initiating and/or participating in the interactive process, Mr. Sadare took a different tact, recording the meeting, keeping a "log book" and retaining Company correspondence in case he needed it "later". At no time did he discuss Dr. Damergis' treatment plan or the accommodations that were prescribed to him.

### G.     Mr. Sadare sends a Second Settlement Letter.

On October 19, 2016, Mr. Sadare's first counsel, Mr. Sharp, sent BASS a short follow-up letter that contained the same settlement language as the first: "Confidential Settlement Communication Not Admissible [sic] as Evidence."

Neither Mr. Sadare nor Mr. Sharp requested any type of accommodation from BASS as of October 19, 2016, notwithstanding BASS' continuous requests that Mr. Sadare initiate and/or engage in the interactive process with BASS. The communication to BASS' General

Counsel regarding "Confidential Settlement Communications" was intended to prompt . . . Confidential Settlement Communications.

Moreover, Mr. Sharp's settlement letters **actually resulted in significant and protracted discussions between Mr. Stuart and Mr. Sharp regarding Mr. Sadare's departure from the company and the terms by which his employment would end**.

At this point, Mr. Sadare had done nothing beyond signing the PIP itself on August 19, 2016, under protest because, in his view, he thought the it was issued "due to his disability." The entirety of the other communications to date, including the specific identification of Narcolepsy and Epilepsy, was made through his attorney in the context of "Confidential Settlement Communications."

Mr. Sadare's actions and go well beyond mere inaction and a failure to actively engage in the interactive process; they were contrived and calculated, evincing his utter bad faith.

### H.      The October 26, 2016, Meeting.

On October 26, 2016, Mr. Sadare met with (and again surreptitiously recorded) Mr. Knapp and Ms. Scherwitz for the purpose of discussing two outstanding topics concerning his immigration. Mr. Sadare's second, three-year H-1B period was set to expire in January 2017. BASS informed Mr. Sadare that: (1) it would not support an extension of the six-year H-1B period beyond January 2017; and (2) BASS would not serve as a sponsor for Mr. Sadare for purposes of his attempt to gain Permanent Residency. As of October 26, 2016, Mr. Sadare knew that his right to continue working for BASS would expire, at the latest, in January 2017.

**I.      Mr. Sadare's November 3, 2016, Request and the Severance Discussions.**

One week following his receipt of the news regarding the impending end to his employment at BASS, he attended yet another appointment with Noran and requested and secured yet a fourth letter from Dr. Damergis (the "Fourth Letter"). Mr. Sadare views this Fourth Letter, and his subsequent attempts to pepper the company with it in the days following, as his "gotcha" moment. It is not. The record prior to November 3, 2016, establishes, as a matter of law, that Mr. Sadare was acting in bad faith and that his own affirmative, intentional obstruction of the interactive process caused its breakdown.

Beyond the indisputable knowledge Mr. Sadare had prior to November 3, 2016, Mr. Sadare also knew that, even if his requests were genuine and even if those job modifications were made, Mr. Sadare would receive an additional two-and-one-half months, through January 2017, to work in his current role, after which his authorization to work in the United States would expire.

Contemporaneous with Mr. Sadare's request for a job modification, in early November 2016, Mr. Sadare knew that his attorney and Mr. Stuart were actively engaged in severance discussions. Severance was intended as a bridge so that Mr. Sadare could obtain a new, third H-1B sponsor, using BASS-provided outplacement services to assist Mr. Sadare in his search. In plain terms, rather than simply pull the rug out from under Mr. Sadare, it allowed Mr. Sadare to continue to work while severance discussions were ongoing. Additionally, Mr. Sadare's attorney, ostensibly with Mr. Sadare's express permission, offered that Mr. Sadare be placed on paid administrative leave while settlement discussions were pending. This was not possible, however, because Mr. Sadare was only physically present in the United States pursuant to a work visa which required him to have a sponsor

8

and to actually work. So, Mr. Sadare continued to work during the pendency of negotiations which ended on December 16, 2016.

Mr. Sadare has attempted to capitalize on both this unworkable request (to place an H-1B, work visa holder on paid administrative leave) and his eventual continued employment with BASS, together with continued performance evaluations beyond the PIP term (through the end of settlement discussions) to argue that the Company's true intentions were sinister. However, BASS' purpose was to give Mr. Sadare an opportunity to locate a new H-1B sponsor and bridge to a new role.

### J.     BASS' Good Faith and Mr. Sadare's Termination.

Notwithstanding that Ms. Scherwitz made the decision to terminate Mr. Sadare for performance in October 2016 shortly following her interaction with him on October 5, 2016, Mr. Sadare was permitted to continue working through December 22, 2016, while his attorney engaged in settlement discussions with Mr. Stuart.

In January 2017, in compliance with Federal Immigration Law, BASS informed Mr. Sadare that it had withdrawn its sponsorship of Mr. Sadare with regard to his H-1B visa, which constituted the sole basis for Mr. Sadare to lawfully work in the United States; and, in accordance with Federal law, BASS offered to pay reasonable costs of transportation for Mr. Sadare to return to his last place of residence abroad, Austria.

Plaintiff filed a Complaint against Defendants in December 2019, asserting three claims under the Minnesota Human Rights Act ("MHRA") – failure to accommodate a known disability, disability discrimination, and reprisal and three claims under the Americans with Disabilities Act (discrimination, failure to accommodate and retaliation).

On December 17, 2021, Defendants moved for summary judgment on Sadare's

9

claims and Sadare filed a Motion for Partial Summary Judgment.

In July 2021, this Court denied both Plaintiff and Defendants' Motions.

## CLAIMS OR DEFENSES

Sadare brings six claims against Defendants: (1) MHRA Reprisal, under Minn. Stat. § 363A.15; (2) ADA Retaliation, 42 U.S.C. § 12203; (3) Disability Discrimination, Minn. Stat. § 363A.08; (4) ADA Disability Discrimination, 42 U.S.C. § 12112; (5) MHRA Failure to Accommodate, Minn. Stat. §363A.08; and (6) ADA Failure to Accommodate, 42 U.S.C. § 12112.

Defendants submit that (1) it terminated Sadare for a legitimate, non-discriminatory, non-retaliatory reason and the reason was not a pretext for illegal discrimination/retaliation, (2) Sadare unreasonably failed to take advantage of preventative opportunities to avoid harm otherwise, (3) it located after-acquired evidence of misconduct by Sadare (violation of the company's no-recording policy), that if known to Bosch at the time of the recording, Sadare's employment would have been terminated, (4) Sadare failed to control a controllable disability by his refusal to follow the treatment plan prescribed to him by his physicians, (5) Sadare failed to attend a drug-screen required by a subsequent employer, AT&T, and this failure resulted in a withdrawal of a conditional offer of employment, cutting off Sadare's entitlement to backpay or reinstatement as of that date, (6) Sadare's preexisting emotional, psychological, and physical condition prior to any alleged wrongdoing by Defendants was such that none of Defendants' acts proximately caused or contributed in any manner to Sadare's alleged injuries or damages and none of the Defendants may be held liable for any such alleged injuries and/or damages, (7) Sadare failed to initiate and/or participate in a meaningful

exchange of ideas regarding the availability of particular reasonable accommodations, (8) the Company acted in accordance with Federal Immigration Law with regard to Mr. Sadare, (9) Sadare was not authorized to work in the United States for a period of time following his employment with BASS and therefore he is not permitted to recover lost wages for that period of time, and (10) neither of Bosch Automotive Service Solutions, LLC, Robert Bosch LLC nor Robert Bosch North America Corporation are Sadare's employers. Defendants further reserve the right to assert any or all of the affirmative defenses raised during this litigation during trial, including those affirmative defenses contained in Defendants' answer.

**UNRESOLVED ISSUES FOR TRIAL**

**1. Whether Sadare was a "disabled person" within the meaning of the MHRA or the ADA.**

The question of whether Sadare was a "disabled person" within the meaning of the MHRA consists of two parts: (1) whether Sadare had a "physical, sensory, or mental impairment" that (2) "materially limits one or more major life activities." Minn. Stat. § 363A.03, subd. 12.

Sadare claims that he suffered from narcolepsy, epilepsy and hypersomnia both prior to, during, and after his employment at Bosch. He also claims that he was substantially limited in one or more major life activities.

The MHRA does not define "major life activities"; however, "[b]ecause the provisions of the MHRA and the Americans with Disabilities Act (ADA) are similar, [courts] look to the federal definition of 'major life activities' for guidance." *Gee v. Minnesota State Coll. and Univ.*, 700 N.W.2d 548, 553 (Minn. Ct. App.

2005) (citing *Kolton v. Cnty. of Anoka*, 645 N.W.2d 403, 407-08 (Minn. 2002)). Under the ADA, major life activities are "those activities that are of central importance to daily life." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 197 (2002). The applicable ADA regulation lists examples of major life activities, including "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]" 29 C.F.R. § 1630.2(i). Sadare claims that his alleged disability impacted his ability to carry out one or more of these defined major life activities.  He claims under the MHRA that these limitations were "material limitations" and "substantial limitations" under the ADA.

## 2.  Whether Defendants knew of Sadare's alleged disability when it made its decision to place Sadare on a Performance Improvement Plan.

Defendants were not aware of any of Sadare's alleged disabilities prior to placing Sadare on a Performance Improvement Plan.

## 3.  Whether Sadare disclosed a disability to Defendants prior to November 2016.

Sadare claims that he disclosed a disability to Defendants on the PIP itself and in a Confidential Settlement Communication sent by Darren Sharp, his first attorney, on September 27, 2016. Sadare did not provide any medical documentation regarding any alleged disability to Defendants and did not request a job modification of any kind until November 2016.

## 4.  Whether Sadare could perform the essential functions of his position with or without reasonable accommodation.

In order to show that he is qualified to perform the essential functions of his position, Mr. Sadare must show (1) that he meets the necessary prerequisites for the job, and (2) that

he can perform the essential functions, with or without reasonable accommodation. *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003). If Plaintiff claims he is unable to perform the essential functions of the position, then he must also make a facial showing that reasonable accommodation is possible and that the accommodation will allow him to perform the essential functions of the job. *See Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000).

"Essential functions of a position are the fundamental duties of the job, and the employer's judgment is considered highly probative." *Otto v. City of Victoria*, 834 F. Supp. 2d 912, 916-17 (D. Minn. 2011), aff'd 685 F.3d 755 (8th Cir. 2012). "An ADA plaintiff may not rely upon past performance to establish that she is a qualified individual without accommodation when the employer has produced undisputed evidence of diminished or deteriorated abilities." *Mole v. Buckhorn Rubber Products, Inc.*, 165 F.3d 1212, 1217 (8th Cir. 1999). Essential functions of an employee's position may be stated in a Performance Improvement Plan provided to an employee.

Mr. Sadare admitted to his physician, Dr. John Damergis of Noran Neurological, that his performance was poor and that he was close to terminated. This is an admission by Sadare that he was unable to perform the essential functions of his position. *Gonzagowksi v. Widnall*, No. CIV 94-0016 MV/LFG, 1995 U.S. Dist. LEXIS 21546, at *28 (D.N.M. Oct. 17, 1995) ("Plaintiff's admitted poor performance in the several months preceding his termination provided Defendant with a legitimate, nondiscriminatory basis for its actions and rebuts any inference of retaliation."); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 953 (N.D. Ga. 1995) (granting summary judgment where "Plaintiff has admitted sufficient facts to show that Plaintiff's performance was unsatisfactory [and] Plaintiff admits to

engaging in many of the behaviors criticized in her . . . performance evaluation."); *Russell v. Geithner*, No. 2:09-cv-00975, 2012 U.S. Dist. LEXIS 162016, at *58 (S.D. Ohio Nov. 13, 2012) ("[Plaintiff] repeatedly acknowledges her performance problems throughout the record, which precludes her from showing that [defendant]'s stated reason has no basis in fact. Nor can [Plaintiff] show that [defendant]'s stated reason did not actually motivate the adverse action."); *Tennial v. UPS*, No. 2:13-cv-02277-JTF-tmp, 2015 U.S. Dist. LEXIS 191464, at *30 (W.D. Tenn. Nov. 12, 2015) (granting summary judgment to employer where "Plaintiff conceded his performance deficiencies during his deposition . . . Plaintiff also acknowledged his deficiencies in his initial pleading [and] . . . admitted that his medical condition caused him episodic incapacities to do his job."); *Khan v. Bank of Am., N.A.*, 572 F. Supp. 2d 278, 295 (N.D.N.Y. 2008) (granting summary judgment to employer where "[p]laintiff admit[ted] to performance errors and behavioral problems" during his employment).

**5.  Whether Sadare suffered an adverse employment action because of his disability.**

Sadare was placed on a PIP prior to Defendants' knowledge of any alleged disability by Sadare.  Sadare failed to improve his performance while on the PIP and was terminated as a result of his failure to improve performance.  Sadare never provided any medical documentation relating to his alleged disability until after his 60-day PIP had expired.

**6.  Whether Sadare is a qualified disabled person for purposes of Plaintiff's claims for Failure to Accommodate under the ADA and MHRA.**

A qualified disabled person is "a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question." Minn. Stat. § 363A.03, subd. 36. "Essential functions of a position are the

fundamental duties of the job, and the employer's judgment in this regard is considered highly probative." *Otto v. City of Victoria*, 834 F. Supp. 2d 912, 916-17 (D. Minn. 2011), *aff'd* 685 F.3d 755 (8th Cir. 2012). Sadare admitted to his doctors that he was not a qualified, disabled person: he admitted that his performance was poor and that he was nearing termination.

**6.  Whether Sadare engaged in the interactive process in good faith.**

**7.  Whether Sadare is responsible for the breakdown in the interactive process.**

The Company is not responsible for the a failure to accommodate where Sadare himself is responsible for the breakdown in the interactive process, as, among other things, he failed to provide medical documentation in his possession, notwithstanding that he had three notes from Noran Neurological in his possession at the time of the October 5, 2016 meeting. *Palmer v. McDonald*, 824 F. App'x 967, 980 (11th Cir. 2020) (*citing D'Onofrio*, 964 F.3d at 1022); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) ("Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process."). Further, "when the parties are 'missing information . . . that can only be provided by one of the parties, . . . the party withholding the information may be found to have obstructed the interactive] process.'" *Jackson v. City of Chi.*, 414 F.3d 806, 813 (7th Cir. 2005) (*quoting Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996)); *see also See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27-28 (1st Cir. 2001) (where plaintiff failed to cooperate or actively engage in the interactive process, employer could not

be held liable for failure to accommodate); *see also Delson v. Mineta*, 144 Fed. App'x 136, 137 (2nd Cir. 2005) (unpublished) ("[P]laintiff's refusal to provide the defendant with any specific medical documentation . . . precipitated the failure of the 'interactive process' between employer and employee that the ADA envisions."); *see also Beck*, 75 F.3d at 1137 (employee's failure to provide her employer with information about her medical condition relieved her employer of liability for failing to provide a reasonable accommodation); *Bostick v. Smith & Wesson Corp.*, Civil Action No. 3:15-cv-30193-MGM, 2017 U.S. Dist. LEXIS 75105, at *28 (D. Mass. Apr. 25, 2017) (plaintiff "was responsible for the breakdown of the interactive process by failing to provide medical documentation."); *Zito v. Donahoe*, 915 F. Supp. 2d 440, 448 (S.D.N.Y. 2012) ("[Plaintiff's] failure to respond to [employer's] requests [for documentation of Plaintiff's disability] clearly constitutes bad faith participation, if it can be called participation at all, in the interactive process[.]"); *Georgia v. City of Bridgeport*, 2020 U.S. Dist. LEXIS 142506, 2020 WL 4586695, at *17 (D. Conn. Aug. 10, 2020) (holding that "[t]he undisputed record shows that [the d]efendant's attempts to engage the plaintiff to initiate the process of providing an accommodation went substantially unanswered, and the [c]ourt therefore finds that there is no genuine dispute that [the p]laintiff is responsible for the breakdown in the interactive process").

**8.   Whether the September 27, 2016 Letter from Darren Sharp contained requests for accommodation.**

The September 27, 2016 letter contains three requests that Sadare contends are requests for reasonable accommodation:

- **Request #1**: Bosch must honor Mr. Sadare's medical appointments and not punish or criticize him for going to them.

16

- **Request #2**: Bosch employees and managers must refrain from unprofessional, demeaning, and harassing comments regarding Mr. Sadare—no matter what form of discriminatory animus they stem from.

- **Request #3**: Bosch must recognize that Mr. Sadare's expressions of lower energy, interest, or concentration do not necessarily indicate any form of lack of commitment, productivity or performance by Mr. Sadare.

None of these are requests for reasonable accommodation. Honoring medical appointments and not criticizing an employee for attending them (Request #1) is simply a statement to follow the law. Mr. Sadare has not alleged that, following this letter, that Defendants somehow prevented him from attending a medical appointment or was critical of him for doing so. Beyond this, Mr. Sadare's requests are not one for a reasonable accommodation at all. *Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1123 (D. Minn. 2011) (internal quotations omitted) (there exists "no authority for the proposition that cessation of harassment is a required reasonable accommodation."); *Cannice v. Norwest Bank Iowa, N.A.*, 189 F.3d 723, 728 (8th Cir. 1999) ("We do not believe, however, that the obligation to make reasonable accommodation extends to providing an aggravation-free environment."); *Gonzagowski v. Windall*, 115 F.3d 744, 747-48 (10th Cir. 1997) (An employee cannot immunize herself from stress and criticism in general); *Gaul v. AT&T, Inc.*, 955 F. Supp. 346, 353 (D.N.J. 1997) (In order to accommodate the plaintiff, the company "would have to insure that he would be guarded against stress and criticism. Such an accommodation is not reasonable, and would impose an undue hardship on the employer").

**9.     Whether the September 27, 2016 or October 19, 2016 letters from Mr. Sharp are "protected activities" for purposes of ADA Retaliation of MHRA Reprisal.**

Both letters sent by Mr. Sharp contain the language "Confidential Settlement Communication: Not [Admissable] (sic) as Evidence." As such, neither should be considered to be a protected activity.

**10.     Whether Sadare suffered an adverse employment action for engaging in a protected activity.**

**11.     Whether Defendants had a legitimate, non-discriminatory, non-retaliatory reason to terminate Sadare's employment.**

**12.     Whether Defendants' legitimate, non-discriminatory, non-retaliatory reason to terminate Sadare's employment was a mere pretext for illegal discrimination/retaliation.**

**13.     Whether Immigration-Related Decisions are Adverse Employment Actions for purposes of Sadare's claim for MHRA Reprisal or ADA Retaliation.**

Sadare claims that refusing to sponsor an H-1B holder for an extension of the six-year H-1B period and discontinuing the permanent residency process for an H-1B holder are adverse employment actions. Neither is. *Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 43-46 (D.D.C. 2017) (*citing Kanungo v. Univ. of Kentucky*, 1 F. Supp. 3d 674, 683 (E.D. Ky. 2014)) ("Title VII does not impose an affirmative obligation on employers to sponsor their employees' visa applications . . . the mere failure to sponsor or continue sponsoring a visa application generally cannot be considered an adverse employment action."); *Kanungo v. Univ. of Ky.*, 1 F. Supp. 3d 674, 683 (E.D. Ky. 2014) ("The delay of visa application processing, or even the decision to not sponsor an H1B visa, does not constitute an adverse employment action."); *Collins-Pearcy v. Mediterranean Shipping Co.*, 698 F. Supp. 2d 730, 760 (S.D. Tex. 2010) (holding that refusal to sponsor employee's visa application, even where it will result in termination of employment, does

not constitute an adverse employment action).

**14.     Whether Sadare's Violation of Bosch's No-Recording Policy Should Bar His Recovery of Backpay and Preclude Front Pay Damage.**

Sadare recorded at least three meetings while he was employed by Bosch: the October 5, 2016 meeting, the October 26, 2016 meeting, and the December 12, 2016 meeting.  All of these recordings were violations of Bosch policy and, if he were found to have violated this policy during his employment, he would have been terminated for making the recordings.  This violation of Bosch policy by Sadare should serve to preclude his recovery of backpay, frontpay, and reinstatement damage after the date of such recordings. *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995).

**15.     Whether Sadare is Entitled to Recover any Backpay or Frontpay damages as a result of his non-authorization to work in the United States after January 2017 through the date of his obtaining subsequent authorization to work in the United States, August 29, 2017.**

Mr. Sadare was eligible to work in the United States because Bosch served as his H-1B sponsor from the beginning of his employment through January 2017.  Bosch withdrew its sponsorship of Sadare following the effective date of his termination in January 2017. For a period of time from January 2017 through August 29, 2017, Mr. Sadare was not eligible to work in the United States. Given that he was not eligible to work in the United States during that time, he should be disallowed from recovering backpay or front pay damage during that time. *Elsherif v Mayo Clinic*, 2019 U.S. Dist. LEXIS 217743, at *3 (D. Minn. Dec. 19, 2019) (denying "[plaintiff]'s request for a protective order preventing [defendant] from pursuing discovery related to his immigration status . . . [plaintiff] has put his immigration status in issue. It is relevant to the case itself, particularly any damages claims [plaintiff] has."); *Egbuna v. Time-Life Libraries*, 153 F.3d 184, 186 (4th Cir. 1998)

(in a Title VII action "[plaintiff] has no cause of action because his undocumented status rendered him ineligible both for the remedies he seeks and for employment within the United States.")

**16.    Whether Sadare is Entitled to Recover any Backpay or Front pay damages after his failure to attend a mandatory drug screen at a prospective employer who conditionally offered him a position, AT&T.**

Sadare applied for and received a conditional offer of employment from AT&T in June 2018.  In connection with this offer of employment, he was required to participate in a drug screen.  He failed to timely participate in the drug screen and his conditional offer of employment was withdrawn by AT&T.  This failure to attend a drug screen should cut off backpay and front pay damage of Sadare as of the date of the failure to attend, if not cut off sooner.

**17.    Whether Sadare can prove that he suffered any emotional distress as a result of his termination.**

Sadare is required to prove that he suffered emotional distress as a result of his termination. He will be unable to show this to the degree of certainty required for recovery. In fact, he informed his Psychologist, Dr. William "Arlow" Andersen, the opposite on or around the time he was notified of his termination.

**18.    Whether Defendants are entitled to a grant of their motions *in limine*, including those regarding (1) whether information and testimony regarding Sadare's claim that he was terminated for "fighting on company property" should be excluded, (2) whether Sadare's backpay damage, or a portion of Sadare's backpay damage, should be excluded as too speculative, (3) whether Sadare should be permitted to present evidence of front pay to the jury, (4) whether documents in the MDHR file, including the determination, position statements and documents submitted to the MDHR should be excluded from evidence, (5) whether references to and/or testimony regarding Kalia v. Robert Bosch Corp. should be excluded from evidence, (6) whether Sadare should be prevented from making inflammatory statements regarding Defendants/Bosch, (7) whether Sadare should be entitled to introduce privilege logs or refer to invocation of the attorney-client privilege/attorney work product doctrine to the jury, (8) whether**

the September 27, 2016 letter from Mr. Sharp is admissible, and (9) whether Sadare is entitled to use the transcript and recording of an unemployment hearing as evidence.

All of these issues have been submitted as motions *in limine* for this court's consideration.

## **CONCLUSION**

Defendants respectfully asks the Court to consider this Trial Brief concerning the above issues for trial.

Dated: **June 12, 2023.**                    **MINENKO LAW, LLC**

By: s/Michael J. Minenko
Michael J. Minenko (#129872)
2051 Killebrew Drive, Suite 611
Bloomington, MN 55425
Telephone: (952) 854-1294
Facsimile: (952) 851-9510
mike@minenkolaw.com

*Attorney for Defendants*